**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**UNITED STATES OF AMERICA,**

Plaintiff**,**

**v.**

**Case No.:   2:19-CR-22
(JUDGE KLEEH)**

**TIMOTHY JUSTON WIMER**

Defendant.

---

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTIONS TO SUPPRESS BE DENIED

This matter is before the undersigned pursuant to Honorable United States District Judge Thomas S. Kleeh's Order (ECF No. 59) referring Defendant Timothy Juston Wimer's First (ECF No. 54) and Second (ECF No. 63) Motions to Suppress filed in this case on October 16 and October 18, 2019, respectively, to the undersigned for a hearing and the issuance of a Report and Recommendation. The Government filed a Response to Defendant's Motions on October 23, 2019 (ECF No. 67).

The undersigned held a Motion Hearing in this matter on Friday, October 25, 2019 at which appeared the Government by Assistant United States Attorneys Stephen Warner and Shawn Michael Adkins and the Defendant, Timothy Juston Wimer, in person and by Counsel Elizabeth Gross and Richard Walker, Assistant Federal Public Defenders. Following the Motion Hearing, Defendant submitted a Reply in Support (ECF No. 72) on Monday, October 28, 2019. Accordingly, this matter is now ripe for a Report and Recommendation to Honorable United States District Judge Thomas S. Kleeh.

This Report and Recommendation examines the following issues: (1) whether the search of Mr. Wimer's residence and property by United States Probation Officers Matthew Bennett and John Meadows on January 15, 2019, pursuant to a condition of his supervised release, was lawful and appropriate in scope; and (2) whether the stop and subsequent search of Mr. Wimer's vehicle by law enforcement on February 22, 2019, was lawful.

Answering both issues presented in the affirmative for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress (ECF Nos. 54 and 63) be **DENIED**.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A.  Home Contact and Subsequent Search by United States Probation on January 15, 2019.

Defendant Timothy Juston Wimer entered a plea of guilty on September 20, 2013, (ECF No. 27) to Four Counts (Counts One, Seven, Nine, and Thirteen) of a Fifteen Count Indictment filed against Defendant on July 24, 2013 (ECF No. 17) in case number 2:13-CR-27. Defendant's original sentence was vacated after the filing of a petition under 28 U.S.C. § 2255. Honorable United States District Judge John Preston Bailey entered an Amended Judgment on December 5, 2016, sentencing Mr. Wimer to eighty-seven months of imprisonment on each of Counts One, Seven, Nine, and Thirteen to run concurrently and giving credit for time served. (ECF No. 86). Importantly, for the issues presented in the present case, District Judge Bailey sentenced Mr. Wimer to three years of supervised release on each of Counts One, Seven, Nine, and Thirteen all to run concurrently. (ECF No. 86)[1]

Defendant's term of supervision began on August 31, 2018. (*See* Petition for Warrant or Summons for Offender under Supervision, ECF No. 94 in case number 2:13-CR-27). As a

---

[1] The ECF citations in this paragraph refer to Defendant's docket in case number 2:13-CR-27.

condition of Defendant's supervision, Defendant agreed to allow the probation officer "to visit you at any time at your home or elsewhere" and Defendant "must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view." (ECF No.71-2, at 2, ¶ 8).[2] Further as part of Defendant's Conditions of Supervision, Defendant agreed as follows:

> Upon reasonable suspicion by the probation officer, you shall submit your person, property, house, residence, vehicle, papers, computers, or other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You shall warn other occupants that the premises may be subject to searches pursuant to this condition.

(ECF No. 71-2, at 2, ¶ 17). Pursuant to these conditions, on January 15, 2019, United States Probation Officers ("USPO") Matthew Bennett and John Meadows conducted a "home contact" at the Defendant's residence. (Gov. Ex. 3, ECF No. 71-7, at 1). While parked in the Defendant's driveway, USPO Meadows and Bennett "noticed someone standing in the doorway of the residence with the door open." Id. Upon the individual seeing USPO Meadows and Bennett in the driveway, "a female closed the door." Id. The Defendant ("offender") greeted USPO Meadows at the door and allowed the officers inside the residence "to conduct the home contact." Id.

Upon entering the residence, USPO Meadows noticed "Cassie Kesner", the Defendant's girlfriend, "in the back bedroom." Id. USPO Meadows "instructed her to sit in the living room" and she complied. Id. Also present in the living room was Ms. Kesner's daughter (approximately 2 years old) and a "third party, later identified as Ashley Beercamp." Id. USPO Meadows and

---

[2] All further ECF citations refer to the docket of the present case, 2:19-CR-22. The Government introduced Defendant's Conditions of Supervision from his sentence in case number 2:13-CR-27 as Government's Exhibit 2 during the Motion Hearing held on Friday, October 25, 2019. Government's Exhibit 2 is ECF No. 71-2 in the present case, 2:19-CR-22.

Bennett "detected tension/nervousness with the occupants." Id. All "parties remained seated in the living room while USPO Bennett began to question the offender." Id. USPO Bennett "escorted the offender outside of the residence to where his vehicle was located." Id. When returning to the residence, USPO Bennett advised USPO Meadows "that the offender provided him with the items in his pockets, which were approximately $300 in US currency, rubber gloves, and a digital scale." USPO Bennett further advised "that the offender admitted to him that he and Beercamp were about to leave to purchase heroin with the money in his pocket." Id.

Upon learning this information, USPO Meadows went to "the offender's bedroom while USPO Bennett remained with the offender outside and looked through his vehicle." Id. USPO Meadows "observed a small black soft bag lying on top of a pile of dirty clothes on the floor." Id. Inside the bag, USPO Meadows found "several small empty baggies, a small clear plastic bag containing a user quantity of what appeared to be crystal methamphetamine, one bag with a chunk of what appeared to be heroin, and one small bag containing several pills." Id. USPO Meadows next observed what initially appeared as a "book lying on the floor, underneath the stand beside the bed in the nearest corner of the room." Id. at 1-2. Upon touching the "book", USPO Meadows discovered the object was actually "a hidden lockbox appearing to be a book." Id. at 2. USPO Meadows observed that, while the lockbox was locked, there was a "small gap between the lid and the container" allowing USPO Meadows to see there "was a large amount of US currency inside." Id.

At that time, "USPO Bennett and the offender approached the bedroom, and the offender was questioned about the suspected drugs" USPO Meadows had located. Id. The Defendant ("offender") "admitted that the drugs were approximately 10 grams of heroin, Fentanyl and a small amount of crystal methamphetamine inside said black bag." Id. USPO Meadows then asked the

4

Defendant ("offender") "where the key to the lockbox was." Id. The Defendant ("offender") gave USPO Meadows "a set of keys that were inside his pocket" and advised that the small key would open the lockbox. Id. Inside the lockbox, USPO Meadows located "various amounts of US currency, in the following bill denominations: $1, $5, $10, $20, $50, and $100 bills." Id. Due to safety concerns, USPO Bennett "searched a bathroom attached" to the Defendant's bedroom "to assure there were no weapons then instructed the offender to sit down on the bathroom toilet and not to get up, which he complied." Id. Ms. Beercamp "was permitted to leave the residence in her vehicle." Id.

USPO Bennett then contacted USPO Brian Kilgore regarding what had happened during the home contact. Id. "USPO Kilgore staffed the situation with ADCUSPO Claxton." (Assistant Deputy Chief USPO Stacey Claxton). Id. Due to the "drugs and amount of currency, USPO Kilgore contacted West Virginia State Trooper Tom Kessel, who operates the area's narcotic task force, and advised him of the situation." Id. State Trooper Kessel and Deputy Matt Byrd "arrived at the residence shortly thereafter, and collected the evidence found in the offender's bedroom, as well as the contents located on his person by USPO Bennett." Id. USPO Meadows confirmed Trooper Kessel's "count of the money that was contained inside the lockbox, which totaled exactly $4,600", excluding the money found on his person by USPO Bennett. Id.

During the time police were collecting evidence, USPO Bennett further "located a soft case lying inside the washing machine." Id. Inside the case, USPO Bennett and Meadows found "one syringe, one small spoon with drug residue (the end of the spoon was wrapped inside a small plastic bag), one small baggie containing drug residue, one blue straw, and one cutip." Id. "Trooper Kessel advised that he did not want to collect the soft case and its contents." Id. After police completed the collection of evidence, the Defendant was read his Miranda Rights, and the police questioned

5

him. Id. "In short, the offender admitted that the majority of the money was from drug distribution, and that the contents found in his bedroom were his." Id. When asked about where he obtained the drugs, Defendant requested an attorney and the interview concluded. Id. The police took possession of the evidence collected while USPO Bennett and Meadows "took possession of the paraphernalia found in the washing machine." Id. at 3. USPO Bennett and Meadows then left the residence and "updated USPO Kilgore on the situation." Id. USPO Bennett further contacted Child Protective Services (CPS) of the West Virginia Department of Health and Human Resources (DHHR) and "made a referral, due to drugs being present in reach of children, and a child being present during that time." Id.

Based upon the events that took place at the USPO's home contact with Defendant, USPO Kilgore filed a Petition for Warrant or Summons for Offender Under Supervision in case number 2:13-CR-27 at ECF No. 94 on the docket of that case. United States District Judge John Preston Bailey granted the Petition and issued a warrant for the Defendant's arrest on the same day. (ECF No. 95 of case number 2:13-CR-27).

### B. Traffic Stop on February 22, 2019

On Friday, February 22, 2019, at approximately 11:00 A.M., "Sergeant C.T. Kessel and Grant County Sheriff's Department Deputy/Task Force Officer A.J. Berg were traveling south on US Route 220 in the vicinity of the Hardy/Hampshire County line." (ECF No. 63-1 at 1).[3] "Investigators were aware of an outstanding warrant through the United States Marshals Service for Timothy Juston Wimer." Id. At this time, Sergeant Kessel "observed a northbound silver Volvo 4 door vehicle which he recalled being at the Timothy Wimer residence during a search on January

---

[3] The information contained herein regarding the traffic stop on February 22, 2019 is taken directly from the West Virginia State Police report submitted as Attachment/Exhibit 1 to Defendant's Second Motion to Suppress *Physical Evidence* (ECF No. 63) in case number 2:19-CR-22.

15, 2019. Id. The vehicle was traveling in the opposite direction and had "just left Hardy County and entered in Hampshire County." Id. Sergeant Kessel "observed the driver which appeared to be Wimer." Id. Sergeant Kessel began to follow the vehicle and contacted "West Virginia State Police Romney Communications and conveyed the above information." Id. Sergeant Kessel "requested assistance in possibly getting the vehicle stopped." Id. Romney Communications "advised Corporal M.M. Massie was en-route to assist." Id. East of the "intersection with US Route 220 and US Route 50, Sergeant Kessel observed Corporal Massie intercept the silver Volvo (bearing West Virginia Registration 63F-199) and turn to make a traffic stop." Id. Sergeant Kessel observed and determined that "the Volvo was attempting to elude Corporal Massie; however, Corporal Massie was able to locate the vehicle." Id.

"Corporal Massie and Hampshire County Sheriff's Department J.D. Smith located/stopped the vehicle at Spaid's Garage on Fox Hollow Road in Hampshire County, West Virginia." Id. The occupants of the vehicle were directed to exit the vehicle and were "secured" and detained at that time. Id. The driver of the vehicle was "identified as Timothy Juston Wimer and the front, seat passenger was identified as Joshua Allen Hinkle." Id. After securing the individuals, "Deputy Smith observed a cloth bag on the ground by the driver's door where Wimer exited." Id. The Officers observed that the "cloth bag was dry even though the ground was saturated from recent rains." Id. Upon examining the bag, Officers located "a quantity of suspected Methamphetamine." Id.

Defendant, Timothy Juston Wimer "remained in custody due to the outstanding warrant." Id. However, the passenger Hinkle was "released" because there "was not any evidence to believe Hinkle was involved in the criminal activity afoot." Id. After being released, "Corporal Massie obtained a handwritten, signed statement from Hinkle." Id. In his statement, "Hinkle confirmed

that he and Wimer were the only individuals in the vehicle" and he further "described Wimer's intent to elude law enforcement but was ultimately caught." Id.

As a result of the "suspected Methamphetamine located at the driver's door, Corporal Massie began to search the vehicle for additional controlled substances." Id. As a result of the search, "Corporal Massie located a loaded pistol behind the driver's seat" and "elected to stop the search and obtain a search warrant before proceeding any further." Id. Corporal Massie further obtained a "handwritten, signed statement form Robert E. Agnew" who had "witnessed Wimer attempting to evade a police cruiser with blue lights and siren." Id. Mr. Agnew "described a four (4) second window which Corporal Massie passed by the vehicle before returning to execute the traffic stop." Id.

Later the same afternoon, "Corporal Massie obtained a Hampshire County Magistrate Court Search Warrant for the silver Volvo being operated by Wimer." Id. Items seized during execution of the search warrant on the vehicle included "suspected Methamphetamine, suspected Heroin, suspected Suboxone sublingual strips, digital scale, plastic bags, $1,250 in United States Currency, cellular phones, and a loaded MAR .32 caliber pistol with magazine and nine (9) rounds of live ammunition." Id.

Corporal Massie obtained a subsequent search warrant on March 4, 2019, for the "cellular phones/tablet seized from the Volvo involved in the incident." Id. at 2. However, no "cellular content was obtained" because the "cellular phones/tablet were locked or not compatible with forensic examination software." Id. Further, on March 22, 2019, "Sergeant Kessel and Deputy Berg met with Sergeant J. Fletcher (WVSP Romney Detachment Commander)" and Sergeant Kessel "took possession of the evidence seized by Corporal Massie." Id.

On August 20, 2019, the Grand Jury for the United States District Court for the Northern District of West Virginia returned an Indictment charging Defendant Timothy Juston Wimer in Eight Counts of an Eight Count Indictment. (ECF No. 1). Defendant was charged with One Count of Possession with Intent to Distribute Heroin, Two Counts of Possession with Intent to Distribute Fentanyl, Two Counts of Possession with Intent to Distribute Methamphetamine, One Count of Possession with Intent to Distribute Buprenorphine, One Count of Unlawful Possession of a Firearm, and One Count of Possession of a Firearm in Furtherance of a Drug Crime all in connection with the events of January 15, 2019 and February 22, 2019 as detailed above.

Defendant had his initial appearance and arraignment before the undersigned on September 25, 2019. (ECF No. 9). Defendant filed a Motion to Suppress *Physical Evidence* (ECF No. 54) on October 16, 2019, and a Second Motion to Suppress *Physical Evidence* (ECF No. 63) on October 18, 2019. The Government filed a Response in Opposition (ECF No. 67) on October 23, 2019. A Motion Hearing was held before the undersigned on Friday, October 25, 2019. The testimony and evidence received during the Motion Hearing is summarized below.

## II.    SUMMARY OF TESIMONY

### A. Home Contact and Subsequent Search by United States Probation on January 15, 2019[4].

### 1.  United States Probation Officer Matthew Bennett

The first witness called by the Government at the Motion Hearing held on October 25, 2019, was United States Probation Officer (USPO) Matthew Bennett. USPO Bennett testified he is assigned to post-conviction supervision as a probation officer at the United States District Court for the Northern District of West Virginia, Elkins Division. (Audio Recording of Motion Hearing

---

[4] The testimony in this section is relevant to Defendant's Motion to Suppress *Physical Evidence* (ECF No. 54) filed on October 16, 2019.

held on October 25, 2019, in Elkins District Judge Courtroom, FTR Gold, at 10:59:00 – 12)[5].

USPO Bennett has been a probation officer for approximately five years. USPO Bennett testified

he knows the Defendant because he was an individual previously on post-conviction supervision.

(10:59:29 – 36). USPO Bennett testified he was at Defendant Timothy Wimer's home on January

15, 2019, to conduct a normal "home contact." (10:59:39 – 51). Assistant United States Attorney

Stephen Warner then introduced Government's Exhibit No. 2 into Evidence detailing the relevant

portions of Defendant's Conditions of Supervised Release. (ECF No. 71-2) (10:59:52 – 11:00:08).

USPO Bennett testified these conditions were in effect during his visit to Mr. Wimer's home on

January 15, 2019.

USPO Bennett further testified that Standard Condition of Supervision No. 8 granted the

probation officers permission to visit the Defendant's home at any time. (11:00:18 – 45). USPO

Bennett testified that Defendant was considered a "high supervision case" which required "more

frequent home visits" than others because he has previously been convicted of sex offenses. High

supervision cases require probation officers to conduct home contacts with the offender at least

once per month. (11:00:46 – 11:01:11). On January 15, 2019, USPO Bennett and USPO John

Meadows went to Mr. Wimer's home. (11:01:30 – 40). USPO Bennett further testified that

Standard Condition No. 17 grants the probation officers a right to search the Defendant's home

upon reasonable suspicion. (11:01:38 – 11:02:29).

Upon pulling into Defendant's gravel driveway on January 15, 2019, to conduct the home

contact, USPO Bennett and Meadows noticed that the front door was open and there was a female

standing behind the screen door. As they approached the residence, the female noticed the

probation officers and "abruptly" closed the door. (11:03:00 – 30). Seeing the female "abruptly

---

[5] All time references contained herein refer to the audio recording of the motion hearing held in the Elkins District Judge Courtroom on Friday, October 25, 2019, found in FTR Gold.

close the door", USPO Bennett and Meadows felt this behavior was suspicious and quickly approached the front door of the residence to knock. (11:03:33 – 11:03:57). USPO Bennett and Meadows were concerned such behavior could potentially signal that she was going inside to tell people the probation officers were there or to hide potential evidence of violations of supervised release. (11:04:14 – 43). Upon getting onto the front porch, USPO Bennett and Meadows heard "some commotion" going on within the home, including people moving around, which further caused the officers to be concerned. (11:04:54 – 11:05:30). Upon knocking on the door, Defendant Timothy Wimer greeted the probation officers and allowed them inside.

Upon entering Defendant's living room, USPO Meadows instructed a third party, Ms. Cassie Kesner, who was in the back bedroom, to come gather and sit in the living room. (11:05:40 – 11:06:12). There was also a young child, approximately two years old, and another female third party, later identified as Ashley Beercamp, present when the probation officers arrived. (11:06:15 – 11:06:39). USPO Bennett testified that the situation in the living room was "tense" and there was "nervousness" going on amongst the individuals in the living room. (11:06:46 – 58). Due to what USPO Bennett and Meadows observed upon approaching the home, the nervousness of the parties in the living room, and the overall tense nature of the situation inside the home, USPO Bennett decided to separate Mr. Wimer by having him step outside of the home to question him regarding what they had observed. (11:07:00 – 20).

USPO Bennett testified that he told Defendant Wimer he was uneasy about what he had observed and questioned him regarding what was going on. (11:07:23 – 40). USPO Bennett described Defendant Wimer as being "fidgety", he was putting his hands in his pockets and taking them out and appeared to be extremely nervous. This caused USPO Bennett to notice a "bulge" in Defendant Wimer's pockets. (11:07:41 – 11:08:07). USPO Bennett then asked Defendant Wimer

what he had in his pockets. Upon emptying his pockets, Defendant Wimer pulled out a "wad of cash and some blue gloves." (11:08:10 – 21). USPO Bennett described the gloves as being a "surgical type, latex" set of gloves. (11:08:24 – 30). USPO Bennett testified this was the "first time he had seen" someone have gloves in their pockets and he "wasn't sure why" Defendant Wimer had the gloves in his pockets at that time. (11:08:32 – 47). In thinking of the safety of himself and his fellow probation officer, USPO Bennett asked if there was anything else in Defendant Wimer's pockets. Defendant Wimer turned around at that time and USPO Bennett noticed what appeared to be a pack of cigarettes in Wimer's back pocket. Upon removing the item, USPO Bennett observed what appeared to be a pack of Marlboro cigarettes, was in fact a set of digital scales. (11:08:53 – 11:09:28).

Pairing the cash and digital scales located on Defendant Wimer's person, USPO Bennett testified he believed there were some "drug related issues going on." (11:09:30 – 40). At that time, USPO Bennett collected the items, stepped back inside the residence, and advised USPO Meadows of what he had found. (11:09:54 – 11:10:20). USPO Bennett testified he had further questioned Defendant Wimer if there was anything inside the house he would be nervous about as well as why he had a large amount of cash, digital scales, and gloves. Defendant Wimer admitted that he and third party, Ashley Beercamp, were about to leave to "go purchase heroin." (11:10:43 – 11:11:09). Based upon his experience as a probation officer, USPO Bennett testified he felt Wimer was attempting to divert his attention from whether or not there would be drugs present in the house, and instead, that he was *only* going to purchase drugs. (11:11:10 – 32). However, USPO Bennett testified he had concern there may be drugs inside the house at that time given the situation and previous knowledge that Defendant had tested positive for illegal drugs in the past. (11:11:41 – 11:12:10).

USPO Bennett testified that he and USPO Meadows informed Defendant Wimer they were going to conduct a search at that time given what they had found. (11:12:30 – 34). USPO Bennett testified that he first searched Defendant Wimer's vehicle, while USPO Meadows stayed inside the residence. The search of Defendant's vehicle yielded drug paraphernalia, including a small glass device identified as a type of "snorting device" often times referred to as a "tooter." (11:12:40 – 11:13:40). USPO Bennett further located two small containers labeled "small bags" as well as an empty plastic bag. (11:13:48 – 11:14:03). After the search of the vehicle, USPO Bennett went back inside the residence with Defendant Wimer wherein USPO Meadows was searching Defendant Wimer's bedroom. (11:14:52 – 11:15:08). USPO Bennett then placed Defendant Wimer in the bathroom to keep him separated from the other parties and USPO Bennett searched the bathroom.  (11:15:02 – 48).

USPO Bennett then spoke with USPO Meadows who indicated that he had found a black bag with drugs and what he believed to be a lockbox while USPO Bennett was outside searching the vehicle. (11:15:57 – 11:16:25). USPO Bennett and USPO Meadows then contacted USPO Brian Kilgore, who was primarily responsible for supervising Defendant Wimer. After speaking with USPO Kilgore, USPO Kilgore contacted Assistant Deputy Chief Stacey Claxton, and advised they would contact the local drug task force given the large amount of cash and drugs found. (11:16:33 – 11:18:03). State Police Sergeant Kessel then arrived on scene, collected the evidence found by USPO Bennett and Meadows, and interviewed Defendant Wimer (11:18:22 – 11:19:12).

Counsel for the Defendant, Elizbeth Gross, Assistant Federal Public Defender then cross-examined USPO Matthew Bennett. (11:19:40). USPO Bennett testified that the purpose of a "home contact" or "home visit" is to make sure the Defendant lives/resides there and that they are following the rules of supervision. (11:20:30 – 45). Upon arriving at the Defendant's residence on

January 15, 2019, USPO Bennett testified he did not detect the "smell of any drugs" or "witness any drug deals" occurring. (11:22:20 – 32). USPO Bennett testified that finding on Defendant Wimer's person the cash, the gloves, the digital scale, and his phone together with Defendant Wimer's statement that he and Ms. Beercamp were about to go purchase heroin was enough to establish reasonable suspicion to conduct a search of the Defendant's home. (11:29:25 – 11:30:33).

Counsel for the Defendant, Elizbeth Gross, then introduced into evidence Defendant's Exhibit No. 2 (ECF No. 71-6), USP Guide to Judiciary Policy Vol. 8 regarding "Search and Seizure Guidelines for United States Probation Officers in the Supervision of Offenders on Supervised Release or Probation." (11:32:20 – 11:33:10). Under the policy, pursuant to a condition of supervision, a probation officer may search a Defendant's home upon either reasonable suspicion or receiving consent. (11:34:02 – 24). USPO Bennett testified that he relied upon reasonable suspicion to search the Defendant's home. USPO Bennett further testified that probation officers can receive a supervisor's approval before initiating a search of an offender's home but may also initiate a search without supervisor approval if exigent circumstances exist. (11:37:03 – 11:37:55).

Upon the close of USPO Bennett's testimony, co-counsel for the Defendant, Richard Walker, Assistant Federal Public Defender, made an oral motion pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure for the production of text messages sent by USPO Bennett during his home contact at Defendant's residence on January 15, 2019. Upon which, USPO Bennett was called back to the stand. USPO Bennett testified that the test messages sent that day were sent from his government issued phone. (11:45:40 – 46). USPO Bennett testified he has since turned over the phone to their technology department and received a new one. The undersigned directed USPO Bennett to follow up with the technology department to determine if the text

14

messages are retrievable, and if so, to follow up with the Court and Counsel regarding the status of the text messages.

### 2.   United States Probation Officer John Meadows

The Government's second witness was United States Probation Officer John Meadows. United States Probation Officer (USPO) John Meadows testified he is a probation officer for the United States District Court in the Northern District of West Virginia, Elkins Division. USPO Meadows testified he has been a probation officer for approximately seven years. USPO Meadows testified he and USPO Bennett conducted a home contact at Defendant's residence on January 15, 2019. (11:49:25 – 36). USPO Meadows' testimony regarding the events and facts leading to the search of the Defendant's residence was consistent with the testimony of USPO Bennett. (11:50:05 – 11:54:22).

Upon USPO Bennett advising that Defendant Wimer was in the possession of cash, gloves, a digital scale, and stated that he was planning to purchase heroin, USPO Bennett advised USPO Meadows they were going to conduct a search. (11:53:50 – 11:54:20). USPO Meadows testified he was directed by USPO Bennett to search the Defendant's bedroom. (11:54:26 – 35). Upon walking into the bedroom, USPO Meadows observed a pile of dirty clothes with a small, soft black bag on top of the clothes. (11:54:36 – 52). USPO Meadows testified that the black bag was in "plain view." (11:54:52 – 11:55:00). USPO Meadows testified that from his experience as a probation officer, he believed that the black bag likely contained illegal drugs as he has often found illegal substances being concealed in similar bags. (11:55:02 – 21).

USPO Meadows testified that he could see "multiple baggies" in the black bag containing substances. Inside the bag, USPO Meadows found methamphetamine, heroin, suboxone, and "some pills." (11:55:25 – 11:56:13). After searching the black bag, USPO Meadows looked to the

left of the room and noticed what appeared to be a "book" on the floor. (11:56:20 – 33). However, upon inspection, USPO Meadows realized it was not a book but a "lockbox that resembled a book." USPO Meadows noticed it was locked and did not open it, however, he could see through a small space on the box and noticed US currency within the lockbox. (11:56:35 – 11:57:10). At that time, USPO Bennett and Defendant Wimer were walking toward the bedroom together. USPO Meadows questioned Defendant Wimer regarding the contents of the black bag as well as the lockbox. Upon questioning, Defendant Wimer advised that inside the black bag, there was 10 grams of heroin and fentanyl as well as a small amount of crystal methamphetamine. (11:58:10 – 27).

USPO Meadows then asked Defendant Wimer where the key to the lockbox was. Defendant Wimer then gave USPO Meadows the key to the lockbox. USPO Meadows opened and searched the lockbox, locating a large amount of U.S. currency. (11:58:30 – 11:59:00). At that time, USPO Meadows testified consistent with the testimony of USPO Bennett, that USPO Kilgore was contacted, he conferred with his superiors, and ultimately, W.V. State Police Sergeant Kessel arrived on scene to collect the evidence and interview the Defendant.

Next, Counsel for the Defendant, Elizabeth Gross, Assistant Federal Public Defender, cross-examined USPO Meadows. Counsel for the Defendant introduced Defendant's Exhibit 3 into evidence (ECF No. 71-7) (12:03:48 – 12:04:10). Defendant's Exhibit 3 was the chronology ("chrono") of events that occurred during the home contact at Defendant's residence on January 15, 2019, as written by USPO Meadows. Regarding USPO Meadows' search of Defendant's bedroom, USPO Meadows testified that his suspicion regarding the "black bag" found in Defendant's bedroom was that, in his experience, evidence of drug use and drug dealing is often kept in similar bags. (12:13:05 – 12:13:50). USPO Meadows further testified that supervisor approval is not necessary prior to initiating a search when the probation officers have reasonable

16

suspicion to conduct the search pursuant to the Defendant's Conditions of Supervised Release. (12:19:15 – 12:19:23).

Upon redirect examination by Assistant United States Attorney Stephen Warner, USPO Meadows testified that the latex gloves in combination of the other items found on the Defendant's person gave rise to the suspicion of fentanyl given that the handling of fentanyl can be dangerous without the protection of gloves. (12:20:10 – 42). USPO Meadows further testified that Defendant Wimer's statement that he intended to buy heroin gave rise to two suspicions, (1) that if Defendant is buying drugs again, there could be drugs in the house, and (2) such statement could be an effort to divert attention away from potential illegal substances or evidence of noncompliance with supervision located in the house.  (12:20:55 – 12:21:37).

### B.  Traffic Stop on February 22, 2019.[6]

#### 1.  Sergeant C.T. Kessel

Following a brief fifteen-minute recess, the Government's next witness called was Sergeant C.T. Kessel of the West Virginia State Police. Sergeant Kessel testified he works for the West Virginia State Police and is currently assigned to the Potomac Highland Drug and Violent Crimes Task Force. Sergeant Kessel has worked in drug enforcement with the Task Force for the past eight years and, overall, Sergeant Kessel testified he has sixteen years of experience in law enforcement. (12:46:45 – 12:47:15).  Sergeant Kessel testified that he is familiar with the Defendant Mr. Wimer because he investigated the Defendant in approximately 2012 for drug distribution. (12:47:40 – 12:48:18).

Further, Sergeant Kessel encountered the Defendant on January 15, 2019, at Defendant's residence after being called there by U.S. Probation following a home check leading to a search

---

[6] The testimony in this section is relevant to Defendant's Second Motion to Suppress *Physical Evidence* (ECF No. 63) filed on October 18, 2019.

that yielded evidence of criminal activity. (12:48:40 – 58). Sergeant Kessel took custody of the evidence found at the Defendant's residence subsequent to the home check and search conducted by U.S. Probation Officers Bennett and Meadows. (12:49:01 – 20). Sergeant Kessel conducted a recorded interview of Defendant Wimer at his home on January 15, 2019. Sergeant Kessel testified he was aware an arrest warrant was issued for Defendant Wimer within the week following the incident at Defendant Wimer's residence on January 15, 2019. (12:49:45 – 12:50:03).

Sergeant Kessel testified he was aware of the existence of the arrest warrant on February 22, 2019. (12:50:05 – 12). On that day, Sergeant Kessel was traveling south bound on U.S. Route 220 coming from Hampshire County into Hardy County. Sergeant Kessel observed a vehicle he had "previously observed at Mr. Wimer's residence" on January 15, 2019. (12:50:14 – 27). The vehicle was a "silver, four door Volvo" that was at Mr. Wimer's house on January 15, 2019, while Sergeant Kessel was there collecting evidence. (12:50:38 - 12:51:10).

On February 22, 2019, Sergeant Kessel was traveling south on U.S. Route 220. Sergeant Kessel testified that the area in which he was traveling, near the Hampshire County and Hardy County line, is close to Mr. Wimer's residence that he visited on January 15, 2019. Sergeant Kessel testified that he observed what he believed was the same vehicle he saw at Mr. Wimer's residence because the vehicle is "unique" in the "rural area" of Hardy County, West Virginia. (12:51:12 – 58). Sergeant Kessel further testified that a silver Volvo "stands out." (12:51:55 – 12:52:02). When Sergeant Kessel observed the vehicle, he saw "a male" that he "believed to be Mr. Wimer operating the vehicle." (12:52:06 – 12). Despite the fact that the "sides" of the car have "tinted windows", Sergeant Kessel was able to observe the driver because they "met in oncoming traffic" and "front to front." (12:52:13 – 35). It was in the afternoon and a "clear" day. (12:52:33 – 41).

When the Volvo passed Sergeant Kessel, he testified that he looked to his partner and said, "there just went Wimer." (12:52:45 – 52). After the vehicle went by, Sergeant Kessel turned around his vehicle and went to follow the vehicle to learn the "tag number" and radio the number into communications and dispatch. (12:52:53 – 12:53:28). Dispatch advised that the vehicle was registered to a "Wayne or Katie Wetzel" which Sergeant Kessel testified further raised his suspicion because "Wayne Wetzel is Kaitlyn Wetzel's father" and "Kaitlyn Wetzel has a child in common with Mr. Wimer." (12:53:35 – 59).

At that point, Sergeant Kessel asked "Romney Communications" if they had a unit available to start in the direction of the vehicle due to a "possible fugitive being in that vehicle." Romney Communications advised they had a "Hampshire County unit available" and they were "starting the unit that way." Sergeant Kessel asked that they could "come that way in the event that they could maybe make a stop on that vehicle." (12:54:15 – 42). Sergeant Kessel testified that a stop was "attempted" on that vehicle and that later resulted in a successful stop, however, at first, the vehicle "attempted to evade law enforcement" (12:54:44 – 53). Sergeant Kessel testified that the vehicle "fled" but he could not confirm if the vehicle was speeding. (12:54:54 – 12:55:01).

Sergeant Kessel arrived on the scene after the stop had occurred and "estimated" that "maybe ten minutes" had passed since he first made contact with the silver Volvo. (12:55:15 – 35). When he arrived on scene, Sergeant Kessel saw the silver Volvo and two males detained he recognized as the Defendant Mr. Wimer and Josh Hinkle. Sergeant Kessel testified that the other officers on scene were "Deputy Smith with the Hampshire County Sheriff's Office, Corporal Massie" and "First Sergeant Plumber with the State Police." (12:55:38 – 12:56:00).

Due to his experience in drug investigations, Sergeant Kessel testified that "if there was a Crown Royal bag underneath the driver's door of the car" he would have searched it "regardless

of any statements that might have been made about it."[7] (12:56:02 – 25). Sergeant Kessel testified that, in his experience, it is "very common" to find "drugs, drug paraphernalia, or drug proceeds in Crown Royal bags." (12:56:26 – 54).

Counsel for the Defendant, Elizabeth Gross, Assistant Federal Public Defender then cross-examined Sergeant Kessel. (12:57:44). Sergeant Kessel testified, again, that the "silver Volvo" in question in this matter is a vehicle that is "not really prevalent" in the "Potomac Highlands" area of West Virginia. (1:04:37 – 47). Sergeant Kessel testified he had only "previously seen the Volvo" in question "one time." (1:05:25 – 32). Sergeant Kessel testified he did not know how fast Mr. Wimer was driving when he saw the silver Volvo on February 22, 2019. (1:05:40 – 1:06:05). Sgt. Kessel testified it had "been conveyed" to him that Mr. Wimer had a federal warrant for his arrest based upon the previous encounter with United States Probation on January 15, 2019, however, Sgt. Kessel did not confirm nor did "Romney Communications" relay to him that the warrant was still active when he called in the silver Volvo on February 22, 2019. (1:06:11 – 1:06:38).

Sgt. Kessel testified that he "did not request a traffic stop" but he had "asked for an officer to start that way" in order to potentially assist with stopping that vehicle because he believed the person driving was Mr. Wimer and he believed Mr. Wimer had an active federal warrant for his arrest. When asked if he "expected them to stop the vehicle", Sgt. Kessel testified "if they observed an infraction they could" but "I did not want them stopping him just based upon my observation." (1:09:33 – 1:10:16).

### 2. Corporal Matthew Massie

The Government next called Corporal Matthew Massie of the West Virginia State Police (1:15:44 – 1:16:04). Assistant United States Attorney Shawn Adkins conducted the direct

---

[7] Corporal Massie and Deputy Smith located and searched a Crown Royal bag found underneath the driver's side door prior to Sergeant Kessel arriving on scene (ECF No. 63-1 at 1).

examination of Cpl. Massie. Cpl Massie testified he has worked for the State Police for fourteen years. (1:16:05 – 07). Cpl. Massie testified on February 22, 2019, he received "radio traffic" from Sgt. Kessel of the West Virginia State Police while traveling on U.S. Route 50 near Romney, in Hampshire County, West Virginia. (1:16:35 – 57). Cpl. Massie testified that Sgt. Kessel had contacted Romney Communications dispatch center and indicated he saw "what he believed" was a vehicle being operated or contained "a subject that was wanted by the Marshals" traveling on Route 220 north toward Route 50. (1:17:06 – 50).

At that time, Cpl. Massie started traveling on Route 220 and passed the silver Volvo that was sent out as a "BOLO" (be on the lookout) for by Sgt. Kessel (1:17:51 – 1:18:25). When Cpl. Massie saw the vehicle, he "turned on" his "emergency lights and turned around on the vehicle." (1:18:30 – 55). Cpl. Massie testified that he was in a "marked vehicle" on that day. Cpl. Massie testified that when he turned on the vehicle, turned on his lights, and attempted to get behind the Volvo, the vehicle "immediately started speeding away." (1:19:13 – 1:19:53). Cpl. Massie testified that the speed limit in the area was "55 mph" and further testified that he was traveling "more than 55 mph" in pursuit of the vehicle. Cpl. Massie testified that he had lost sight of the vehicle. (1:19:51 – 1:20:20).

Cpl. Massie continued "east on 50" in the direction that he thought the vehicle had gone. (1:20:25 – 31). Cpl. Massie testified he traveled to another "straightaway" and still could not see the vehicle. As a result, Cpl. Massie turned around and "saw Deputy Smith" coming towards him. Deputy Smith had also "heard the radio traffic" issued by Sgt. Kessel and Deputy Smith was also traveling with "his lights on." (1:20:35 – 1:21:13). Because he could no longer see the vehicle, Cpl. Massie reasoned that it must have "turned off somewhere" between where he had seen the vehicle and the straightaway. (1:21:18 – 43). Upon making his way back to the area, Cpl. Massie

noticed the vehicle turn onto "Fox's Hollow Road". Cpl. Massie turned on the road to follow it, still with "his lights on." (1:21:45 – 1:22:02). Upon passing a Spaid's Garage business on Fox's Hollow Road, Cpl. Massie noticed a "gentleman out front pointing" toward the rear of the building. When Cpl. Massie pulled around to the back of the building, he saw the "vehicle stopped there." (1:22:22 – 1:23:06). Cpl. Massie saw two individuals in the vehicle, a driver and a passenger. Cpl. Massie approached the passenger side while Deputy Smith approached the driver. (1:23:44 – 59). Cpl. Massie "had the passenger step out at gun point" because they had "tried to elude" him and he had been advised there could be "a wanted subject in the vehicle." (1:24:02 – 18).

The individuals complied and Cpl. Massie placed the passenger in hand cuffs. Meanwhile, Deputy Smith "engaged the gentleman that was on the driver's side of the vehicle" who was identified as Timothy Wimer, the subject Sgt. Kessel advised was "wanted" on a federal warrant. (1:24:43 – 1:25:04). Deputy Smith placed Mr. Wimer in handcuffs. At that time, Deputy Smith "pointed out a Crown Royal bag laying under the vehicle on the driver's side." (1:25:43 – 54). Cpl. Massie had not observed the Crown Royal bag prior to Deputy Smith seeing it. Cpl. Massie picked up the ba.  (1:25:54 – 1:26:14). Mr. Wimer stated to Deputy Smith that "there was some methamphetamine in the bag." (1:26:28 – 37). At that point in time, Cpl. Massie was "engaged with Mr. Wimer trying to get his identity" by going through Mr. Wimer's wallet to find his "driver's license or I.D. card." (1:26:39 – 1:27:00). Upon conducting a "pat down" of Mr. Wimer, Cpl. Massie was made aware of a "lighter and a glass pipe." (1:27:02 – 25). Cpl. Massie, in his experience, believed the pipe "was used for drug use." (1:27:26 – 44).

After removing these items, Cpl. Massie "looked through the Crown Royal bag" where he located suspected illegal substances. After finding the illegal drugs in the Crown Royal bag, officers began to search Mr. Wimer's vehicle.  (1:27:50 – 1:28:15). During the search of the

vehicle, Cpl. Massie located a loaded gun in a "book bag" in the rear driver's side of the vehicle. (1:50:00 – 1:50:55). At that time, officers decided to seek a search warrant for further search of Defendant's vehicle. (1:50:56 – 1:51:42).

Upon the close of direct examination of Cpl. Massie, Counsel for the Defendant, Richard Walker, Assistant Federal Public Defender, requested to make a motion outside of the presence of the witnesses. Mr. Walker requested the Government supplement its pleading filed on October 23, 2019 (ECF No. 67) due to what Mr. Walker and the Defense perceived as a "change in strategy" as a result of Sgt. Kessel's testimony that he was not asking for a traffic stop based on the warrant "because he could not confirm Wimer's identity." In response, the Government clarified that it was "surprised" by Sgt. Kessel's testimony and clarified that its argument in support of the traffic stop on February 22, 2019, was "possible fugitive plus evasive conduct" observed by Cpl. Massie created probable cause for the stop. Mr. Walker advised that the Defense was satisfied that Mr. Warner's Response on behalf of the Government was a satisfactory supplement and felt his request made in the oral motion was satisfied. (1:53:51 – 2:06:00).

The witness, Cpl. Massie was called back to the stand and Counsel for the Defendant, Elizabeth Gross, conducted cross-examination. (2:06:40). On cross-examination, Cpl. Massie testified that he initially attempted to stop the vehicle based on Sgt. Kessel advising there was an active warrant for Mr. Wimer's arrest. (2:14:46 – 53). Cpl. Massie testified that Deputy Smith was the officer who first located the vehicle on Fox Hollow's Road after Cpl. Massie had lost sight of it. When asked if it would have changed his decision to stop the vehicle if he knew that Sgt. Kessel "wasn't positive", Cpl. Massie testified that he "wouldn't think that he would pass on the information if he wasn't positive." (2:15:00 – 39).

### 3. Deputy John D. Smith

Lastly, the Government called Deputy John D. Smith as a witness. Deputy Smith is currently employed at the Hampshire County Sheriff's Office. (2:31:15 – 30). Deputy Smith was employed in this capacity on February 22, 2019. On this day, Deputy Smith heard through central dispatch, Romney Communications, to be on the lookout for a silver Volvo. (2:31:40 – 2:32:02). Deputy Smith responded to assist and back up Cpl. Massie in stopping the silver Volvo. Deputy Smith and Cpl. Massie located the suspect vehicle on Fox's Hollow Road located parked behind a building, Spaid's Garage. (2:33:10 – 34). Deputy Smith's testimony was consistent with the testimony of Cpl. Massie regarding the stop and encounter with the occupants of the silver Volvo.

Deputy Smith testified that, for safety, after ordering the occupants out of the vehicle, Deputy Smith "patted down" the Defendant, Mr. Wimer for safety concerns. (2:35:08 – 38). Defendant admitted there was a lighter and a "tooter" in his pockets. Deputy Smith recognized the word "tooter" as slang for drug paraphernalia. (2:35:40 – 2:36:00). At that point, Deputy Smith placed Mr. Wimer in handcuffs and detained him. After walking along the driver's side of the vehicle, Deputy Smith noticed a brown bag under the driver's side door of the vehicle. (2:36:22 – 2:36:38). Deputy Smith asked Mr. Wimer if the bag was his and Mr. Wimer advised that it was. Mr. Wimer further advised the bag might have "a little bit of meth" in it. (2:36:45 – 2:37:02). Deputy Smith picked up the bag, opened it, and located "two white containers." (2:37:05 – 25). Upon which, Deputy Smith and Cpl. Massie searched the vehicle, Cpl. Massie located a handgun, and the officers subsequently sought a search warrant before continuing their search.

Next, Counsel for the Defendant, Elizabeth Gross, cross-examined Deputy Smith. (2:40:00). On cross-examination, Deputy Smith testified that he heard through central dispatch that a trooper from Hampshire County was in the area of a silver Volvo pursuant to a "BOLO" (be

on the lookout call) and Deputy Smith responded as "back up." (2:41:13 – 55). Deputy Smith confirmed that he located the "Crown Royal" bag underneath the vehicle wherein he located "two pill bottles." (2:42:30 – 50).

### III.   CONTENTS OF THE PARTIES

**A. Defendant's Motion to Suppress (ECF No. 54)**

Defendant's Motion to Suppress *Physical Evidence* (ECF No. 54) seeks suppression of all evidence seized as a result of the search conducted during the home contact by United States Probation Officers John Meadows and Matthew Bennett on January 15, 2019. (ECF No. 54 at 4). Defendant argues that "Officer Meadows conducted a search inside Mr. Wimer's bedroom that *exceeded* the authority provided by the standard conditions of supervision in effect" on January 15, 2019, and thereby "violated Mr. Wimer's Fourth Amendment rights." Id. at 7. Defendant contends that Officer Meadows "lacked the requisite reasonable suspicion for a search" as required by the Defendant's Conditions of Supervised Release. Id.

The Defendant further argues that when "Officer Meadows entered the bedroom, he did not see anything indicative of drug use or drug dealing in the bedroom prior to searching the laundry pile" and "there was nothing about the black bag, or the lockbox he seized suggesting that these items were associated with drug use, drug dealing, or any other type of crime." Id. at 8. Therefore, the Defendant argues the Defendant's Fourth Amendment rights were violated and the evidence found as a result of this incident should be suppressed.

**B. Defendant's Second Motion to Suppress (ECF No. 63)**

Defendant's Second Motion to Suppress *Physical Evidence* (ECF No. 63) seeks suppression of all evidence obtained pursuant to the traffic stop and subsequent search that occurred on February 22, 2019. (ECF No. 63 at 1). First, the Defendant argues that the traffic stop

"was unlawful because it lacked reasonable suspicion." Id. at 6. The Defendant relies upon the radio communications between the officers in which it was relayed that there "*may* be a person driving a Volvo eastbound on US Route 50 that *might* have a federal warrant." Id. As such, Defendant argues that the stop was based "on a mere hunch that the person driving a silver Volvo on 220 *may* be Timothy Wimer, who *might* have a federal warrant because Sgt. Kessel recalled previously seeing a silver Volvo parked . . . at a home in which Timothy Wimer was living." Id. at 7. Defendant further contends that Mr. Wimer did not commit any traffic violations, was a licensed driver, and the Vovlo was not illegal in anyway. Id.

Defendant next contends that the "search of the Volvo was unlawful because it was searched without a warrant and without consent and there was no probable cause to believe there was evidence of drugs *in* the vehicle." Id. Defendant argues that officers relied upon an "illegally obtained statement" that there may be a "little bit of meth" in the bag found under Mr. Wimer's vehicle because the statement was given "without being read his Miranda warnings." Id. Defendant further argues that officers "lacked probable cause to believe there was evidence of drugs in the vehicle." Id. Defendant argues that "drugs thrown outside of a vehicle onto the ground does not make it more probable that more drugs would be found inside of that vehicle." Id. at 8. On the contrary, Defendant argues that "if a person is attempting to discard their drugs from a vehicle, it would be highly probable that there would be no drugs inside of a vehicle." Id.

Last, Defendant argues that the subsequent "warrant should be found invalid because it lacked probable cause, the affidavit materially omitted the fact that the vehicle was searched and there were no drugs found, and the officer relied upon the illegally seized evidence to seek the warrant." Id. Further, Defendant argues that the "independent source doctrine" would not apply because the officers "considered their illegal search, which unveiled a firearm when requesting a

26

warrant." Id. at 9. Defendant contends that because the officers had already performed a "very thorough search of the vehicle" prior to seeking the warrant, "they *knew* that there was no 'evidence pertaining to the manufacture, deliver, and or/ possession with intent to deliver a controlled substance." Id. Accordingly, Defendant requests the evidence seized on February 22, 2019 be suppressed.

### C. Government's Response (ECF No. 67)

The Government's Response in opposition to Defendant's Motion to Suppress addresses the Defendant's arguments regarding the traffic stop conducted on February 22, 2019. (ECF No. 67). The Government argues that the stop was lawful because "Sgt. Kessel had probable cause to believe the Volvo contained a person for whom there was an outstanding arrest warrant." Id. at 5. The Government further argues that the officers' question of Defendant regarding what was contained in the bag was "pursuant to the officers protective sweep" and was therefore, lawful. Id. at 6. Finally, the Government contends that "because methamphetamine fell out of the car when Wimer exited it" the "officers reasonably expected and believed, in light of their experience, that . . . contraband was in the vehicle." Id. Accordingly, the Government argues that "the Fourth Amendment permitted a complete search of the vehicle" and the evidence should not be suppressed.

### D. Defendant's Reply in Support (ECF No. 72)

Following the Motion Hearing held on October 25, 2019, the Defendant submitted a Reply in Support of his Motion to Suppress (ECF No. 72) on October 28, 2019. Regarding the search of Defendant's residence following a home contact by United States Probation on January 15, 2019, Defendant contends that the "United States Probation Officer Meadows conducted an unlawful search of a container in the Defendant's bedroom because he lacked reasonable suspicion that

contraband or evidence of a violation of the conditions of supervision may be found in the container that was searched." (ECF No. 72 at 2). Defendant argues that, to allow "Officers to search all containers and spaces in a home without articulable reasonable suspicion as to each place and each item searched would amount to an abandonment of the rights of people under supervision." Id. at 3. Defendant argues that Officer Meadows lacked "articulable reasonable suspicion that there would be evidence" of illegal activity or of violations of supervision contained in the black bag searched by Officer Meadows in Defendant's bedroom. Id. at 2-4.

Next, Defendant argues with regard to the traffic stop on February 22, 2019, that the "officers conducted an unlawful traffic stop upon the Defendant as they lacked reasonable suspicion and probable cause." Id. at 4. The Defendant argues that the Government has failed to "prove that Sgt. Kessel had probable cause to believe there was an outstanding warrant for Timothy Wimer or that the driver was in fact, Timothy Wimer." Id. The Defendant further argues that the "government failed to present evidence of a traffic violation" and Defendant's vehicle was stopped based "*solely* on the information provided through the radio communications with Sgt. Kessel. Id. Defendant further argues that "Sgt. Kessel testified that he did *not know* that there was a warrant for Timothy Wimer and *did not* expect an officer to stop the vehicle on that basis." Id. at 5. Defendant contends that even "if a warrant had been issued at some time after the investigation in January pertaining to Mr. Wimer, the warrant could have been recalled or otherwise disposed of prior to the traffic stop in February" and Sgt. Kessel "did not call and check with the US Marshals that morning or during the pursuit to see if there was an active warrant." Id.

Finally, the Defendant argues that "Cpl. Massie conducted an unlawful search of the Defendant's vehicle and its containers because there was an insufficient nexus between the small quantity of drugs the defendant admitted to throwing under the vehicle and drug activities in the

vehicle." Id. at 6. Defendant argues that the "Government relies on the fallacy that if there are drugs found outside of the vehicle, therefore, it is more probable that drugs would be found inside of the vehicle." Id. at 7. Defendant further argues that "the connection between a small amount of suspected methamphetamine in a crown royal bag tossed outside of a vehicle is too attenuated to create a fair probability that more drugs would be inside of the vehicle." Id. Accordingly, Defendant requests the evidence seized on January 15, 2019 at Defendant's residence and on February 22, 2019, pursuant to the traffic stop, all be suppressed.

## IV.    LEGAL ANALYSIS

### A. The search of Defendant's residence on January 15, 2019, following a home contact by United States Probation.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, when an individual is on probation or supervised release, he or she may be subject to "search conditions" which "significantly diminish" an individual's "reasonable expectation of privacy." United States v. Hill, 776 F.3d 243, at 248-49 (4th Cir. 2015) (quoting United States v. Knights, 534 U.S. 112, at 119-20 (2001).

In United States v. Knights, 534 U.S. 112, 114 (2001), "the Court held that a probation officer with reasonable suspicion could search a probationer's residence without a warrant when the probationer had agreed to a warrantless search condition." Hill, 776 F.3d at 248 (citing Knights, 534 U.S. at 118). The Court in Knights "found the search reasonable under the totality of the circumstances, 'with the probation search condition being a salient circumstance.'" Id. In order to determine the reasonableness of the search, "the Court balanced the privacy intrusion against the government's need to conduct the search to promote its legitimate interests." Id. at 248 – 49. The Court found as relevant "to both was Knights's 'status as a probationer subject to a search

condition.'" Id. at 249 (citing Knights, 534 U.S. at 119). In terms of the Government's need, "the Court identified the government's interest in monitoring probationers closely because of their greater likelihood of committing a crime than the general population." Id. at 249 (citing Knights, 534 U.S. at 121). Ultimately, the Court "held that 'the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house.'" Id.

The United States Court of Appeals for the Fourth Circuit found that "the specific probation condition authorizing warrantless searches was critical" to the United States Supreme Court's holding in Knights. Hill, 776 F.3d at 249. The Court in Knights held "the warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." Hill, 776 F.3d at 249 (quoting Knights, 534 U.S. at 122). The Court further "underscored that the 'probation order clearly expressed the search condition and Knights was unambiguously informed of it.'" Id. (citing Knights, 534 U.S. at 119).

In Hill, the Fourth Circuit ordered that evidence be suppressed in large part because no such warrantless search condition existed. Hill, 776 F.3d at 249-50. Accordingly, the undersigned finds that the primary consideration for the Court in cases such as Hill, Knights, and the case at hand is the existence and language of a search condition as part of a probationer's supervision.

1. **The undersigned recommends Defendant's Motion to Suppress (ECF No. 54) be denied because United States Probation Officers John Meadows and Matthew Bennett lawfully searched the Defendant's residence based upon reasonable suspicion that Defendant was violating his supervision pursuant to Paragraph 17 of Defendant's Conditions of Supervised Release.**

Here, the Defendant, Mr. Timothy Wimer, was subject to a specific supervised release condition authorizing warrantless searches. Under Paragraph 17 of Defendant's Conditions of Supervised Release, Defendant agreed as follows:

> Upon reasonable suspicion by the probation officer, you shall submit your person, property, house, residence, vehicle, papers, computers, or other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You shall warn other occupants that the premises may be subject to searches pursuant to this condition.

(ECF No. 71-2, at 2, ¶ 17). Further, of particular relevance, in conducting home visits and directing a Probation Officer's considerations when deciding to conduct a search, the United States Probation Office in this District follows the Guide to Judiciary Policy, Vol. 8: Probation and Pretrial Services, Pt. E: Post Conviction Supervision, Ch. 3: Framework for Effective Supervision, Appx. 3A: Search and Seizure Guidelines. (Def's Ex. 2, ECF No. 71-6)[8]. Under Section II A. of the Guidelines, a United States Probation Officer may conduct a search only upon a "special court-imposed search condition or upon the consent of the offender." (ECF No. 71-6 at 2).

Further, under Section III A. of the Guidelines, the requirement of reasonable suspicion as noted in Paragraph 17 of the Defendant's Conditions of Supervised Release, is defined as "a reasonable suspicion that contraband or evidence of a violation of the conditions of supervision may be found at the place or in the item being searched." (ECF No. 71-6 at 5; Section III A. 1.). The Guidelines define the existence of reasonable suspicion as "when the officer, based on particularized and articulable facts, reasonably believes that contraband or evidence of a violation of the conditions of supervision may be found at the place or in the item being searched." (ECF No. 71-6 at 5; Section III A. 2.).

---

[8] The undersigned would note that Defendant's Exhibit No. 2, ECF No. 71-6, is titled as "Guide to Judiciary Policy, Vol. 8: Probation and Pretrial Services, Pt. E: Supervision of Federal Offenders, Appx. 4A: Search and Seizure Guidelines. The Guidelines cited herein appear to be the most up to date according to JNET as shown at this link: http://jnet.ao.dcn/policy-guidance/guide-judiciary-policy/volume-8-probation-and-pretrial-services/part-e-post-conviction-supervision/appx-3a-search-seizure-guidelines These guidelines, with respect to the provisions for searches and seizures relevant to the present Motion, do not differ in any substantive way from those presented by the Defendant in Exhibit 2 (ECF No. 71-6).

Here, the undersigned finds that an express condition allowing for warrantless searches existed and Defendant was explicitly aware of and agreed to the condition. The undersigned further finds that the search conducted by United States Probation Officers Matthew Bennett and John Meadows was proper under both Paragraph 17 of the Defendant's Conditions of Supervised Release (ECF No. 71-2 at 2, ¶ 17) and the Guide to Judiciary Policy as detailed above. (ECF No. 71-6). The undersigned further finds that Officers Bennett and Meadows possessed the requisite reasonable suspicion to conduct the search as defined under the Guidelines.

Upon approaching and entering the Defendant's home for a home contact visit, Officers Meadows and Bennett observed several actions on the part of the Defendant and third-parties present at the Defendant's residence consistent with nervous behavior. Feeling unsafe and uneasy about the situation going on at the Defendant's residence, USPO Bennett asked the Defendant to step outside. USPO Bennett observed that the Defendant was being "fidgety" and putting his hands in his pockets and taking them out, appearing to be extremely nervous. USPO Bennett noticed a "bulge" in the Defendant's pockets. Upon asking the Defendant what was in his pockets, Defendant complied and revealed he had approximately $300 in United States currency and blue latex gloves. Defendant further revealed he had a concealed digital scale in his back pocket that appeared as a pack of cigarettes. Defendant admitted to the USPO's that he and a third-party present at the home, Ashley Beercamp, were about to leave to "go purchase heroin." Based upon his experience as a United States Probation Officer, USPO Bennett believed the Defendant was attempting to divert his attention away form the possibility of drugs being located in his residence.

The undersigned finds these circumstances coupled with the USPOs' knowledge that the Defendant had recently tested positive for illegal drugs in the past[9] gave rise to reasonable

---

[9] *See* Non-Compliance Summary, (ECF No. 92 at 1) in case number 2:13-CR-27 stating Defendant tested positive for morphine/opiates on November 20, 2018. Less than two months before the home contact on January 15, 2019.

suspicion that drugs may be present in the Defendant's residence and, primarily, reasonable suspicion that evidence of a violation of conditions of supervision would be present in the Defendant's home. At that time, Officers Bennett and Meadows began a simultaneous search. While Officer Bennett searched the Defendant's vehicle, Officer Meadows began a search of the Defendant's bedroom. In the bedroom, Officer Meadows located a black bag and a concealed lockbox, appearing as a book. The Defendant contests Officer Meadows' reasonable suspicion to search the black bag and the lockbox. However, the undersigned finds the Defendant's contentions without merit.

Once the Defendant was found with evidence indicative of both drug use and drug distribution and provided an admission that he was about to "go purchase some heroin", USPOs Bennett and Meadows had reasonable suspicion to search any place that may reasonably contain evidence of violations of Defendant's conditions of supervision. Officer Meadows testified that, in his experience, illegal drugs and the proceeds of the illegal distribution of controlled substances are often kept in black bags and lockboxes similar to those located in the Defendant's bedroom. The undersigned agrees that, given the totality of the circumstances, it was reasonable to believe evidence of controlled substances, distribution of controlled substances, and evidence of violations of Defendant's conditions of supervision would be located in both the black bag and the lockbox.

As such, the undersigned **RECOMMENDS** the District Judge find USPOs Bennett and Meadows conducted a lawful search of Defendant's residence, based upon the requisite reasonable suspicion under Paragraph 17 of the Defendant's Conditions of Supervised Release (ECF No. 71-2 at 2, ¶ 17) and as defined under the Guide to Judiciary Policy (ECF No. 71-6, at 5). Accordingly, the undersigned **RECOMMENDS** the Defendant's Motion to Suppress *Physical Evidence* (ECF No. 54) be **DENIED**.

**B.  The traffic stop and subsequent search of Defendant's vehicle on February 22, 2019.**

A vehicle stop is permitted upon reasonable and articulable suspicion of unlawful conduct. Untied States v. Arvizu, 534 U.S. 266, 273-75 (2002). "Whether reasonable suspicion exists depends upon the totality of the circumstances, including the information known to the officer and reasonable inferences to be drawn at the time of the stop." United States v. Jennings, No. 6:06-CR-00004, 2008 U.S. Dist. LEXIS 81693, at *5 (W.D.Va. Oct. 15, 2008) (citing Arvizu, 534 U.S. at 273). "While reasonable suspicion consists of more than a 'mere hunch,' it need not rise to the level of probable cause and falls considerably short of the preponderance of the evidence standard. Id. at 5-6 (citing Arvizu, 534 U.S. at 274).

In Jennings, at the time the vehicle stop was made, there was an outstanding arrest warrant for an individual's arrest that was a passenger in the vehicle. Jennings, 2008 U.S. Dist LEXIS 81693, at * 6. "Officers with the Appomattox Sheriff's Office were '98% sure' that they saw Hamlette" (the individual with an outstanding arrest warrant) "exit the residence where they were conducting surveillance of and enter a blue Buick . . ." Id. at * 6. The Deputy that made the stop "acted on the identifying description of the Buick, provided to him by the Sheriff's Office, when he stopped the vehicle." Id. "The description of the vehicle and the other officers' near-certain conclusion that Hamlette was inside amounted to reasonable suspicion justifying . . . the stop of the vehicle." Id.

**1.  The undersigned recommends Defendant's Motion to Suppress (ECF No. 63) be denied because officers stopped Defendant's vehicle based upon reasonable, articulable suspicion that Defendant was driving the silver Volvo, there was an active warrant for his arrest, and Defendant attempted to evade law enforcement in violation of W. Va. Code § 61-5-17(e)).**

Here, similar to Jennings, Sgt. Kessel had a reasonable belief, based upon the totality of the circumstances, that the individual driving the silver Volvo in this case was the Defendant,

Timothy Wimer, and that Mr. Wimer had an active federal warrant for his arrest. Sgt. Kessel was present and assisted in the collection of evidence at Mr. Wimer's home on January 15, 2019. Sgt. Kessel was aware that the search at Mr. Wimer's home on January 15, 2019, was conducted following a home contact by United States Probation Officers because Mr. Wimer was on federal supervision. As a result of the search and collection of evidence, Sgt. Kessel testified he was later notified that an arrest warrant was issued for Mr. Wimer's arrest based upon his violations of federal supervised release as discovered on January 15, 2019. Sgt. Kessel was familiar with Mr. Wimer having investigated him in a prior drug investigation in 2012. Sgt. Kessel saw a silver Volvo parked at Mr. Wimer's residence during the incident on January 15, 2019.

When Sgt. Kessel saw the silver Volvo on February 22, 2019, it was travelling toward his police vehicle and Sgt. Kessel viewed the driver through the front windshield of the vehicle. Upon seeing the silver Volvo go past him, Sgt. Kessel immediately turned to his partner and stated, "there goes Wimer." Sgt. Kessel testified it is "rare" to see a silver Volvo of this type in Hardy County, West Virginia and that such a vehicle "stuck out" in his memory. Further, upon following the vehicle and running the registration through Romney Communications central dispatch, the vehicle came back as registered to a Wayne or Katie Wetzel. As a result of his prior drug investigation of Mr. Wimer in 2012, Sgt. Kessel recalled that Kaitlyn Wetzel and Mr. Wimer had a child in common, further confirming his suspicion that the driver was Mr. Wimer.

Sgt. Kessel called into Romney Communications to have a local unit in Hampshire County, W.V. be on the lookout "BOLO" for the silver Volvo. During his call with central dispatch, Sgt. Kessel stated the driver was a "possible fugitive." (*See* Def's Ex. 7, ECF No. 71-11, CD Audio Recording of CAD from February 22, 2019). This information was relayed to a unit in the nearby area and Cpl. Massie and Deputy J.D. Smith responded to the "BOLO." Cpl. Massie saw the silver

Volvo in question drive past him and immediately turned on his "emergency lights", turned on the vehicle to follow it, and attempted to affect a traffic stop. Upon attempting to stop the vehicle, Cpl. Massie testified the "vehicle immediately started speeding away." Cpl. Massie testified that the speed limit in the area was "55 mph" and further testified that he was traveling "more than 55 mph" in pursuit of the vehicle. Cpl. Massie testified he had lost sight of the vehicle prior to locating it stopped behind a building on Fox Hollow's Road, after an individual was spotted pointing toward the suspect vehicle in back of the building. At that time, Cpl. Massie and Deputy Smith approached the vehicle and ordered the occupants out at gun point to detain the individuals.

The undersigned finds, under the totality of the circumstances, Cpl. Massie and Deputy Smith, based upon the information provided by Sgt. Kessel regarding the possible fugitive in combination with the evasive conduct observed by Cpl. Massie upon his attempt to stop the vehicle, created a sufficient reasonable and articulable suspicion of unlawful conduct to stop the vehicle.

While Sgt. Kessel testified that he "did not request a stop" because he could not confirm the driver was Mr. Wimer, such confirmation is not necessary to create the requisite reasonable, articulable suspicion. The totality of the information known to Sgt. Kessel at the time he called the "possible fugitive" into central dispatch was sufficient to establish a reasonable, articulable suspicion that the driver of the silver Volvo was Mr. Wimer and Mr. Wimer had a federal warrant for his arrest. Cpl. Massie testified that he "wouldn't believe" Sgt. Kessel would have "passed on the information if he wasn't positive" that the driver was Mr. Wimer and Mr. Wimer had an active federal warrant for his arrest.

Further, upon the information of a possible fugitive being relayed to Cpl. Massie and Deputy Smith, Cpl. Massie attempted to stop the silver Volvo and the vehicle immediately "started

speeding away." At one point, Cpl. Massie "lost sight of the vehicle." While not specifically cited as a basis for the stop, the undersigned would note that under W.Va. Code § 61-5-17(e), "[a] person who intentionally flees or attempts to flee in a vehicle from a law-enforcement officer, probation officer or parole officer acting in his or her official capacity after the officer has given a clear visual or audible signal directing the person to stop is guilty of a misdemeanor . . ." Here, Cpl. Massie activate his emergency lights and attempted to stop the vehicle, thereby giving a "clear visual or audible signal directing the person to stop." As such, Defendant's attempt to evade law enforcement created reasonable, articulable suspicion of criminal activity and an independent basis for the stop. Accordingly, the undersigned finds that the traffic stop was justified at its inception based upon reasonable and articulable suspicion that the driver of the silver Volvo was Mr. Wimer, that Mr. Wimer had an active arrest warrant, and that the vehicle was attempting to evade law enforcement and elude a stop.

> **2.  The undersigned recommends Defendant's Motion to Suppress (ECF No. 63) be denied because officers had probable cause to search the silver Volvo upon locating the Crown Royal bag near the driver side of the vehicle and Defendant's admission that it contained methamphetamine.**

Defendant next contends that the "search of the Volvo was unlawful because it was searched without a warrant and without consent and there was no probable cause to believe there was evidence of drugs *in* the vehicle." Defendant argues that the existence of drugs outside of the vehicle does not create probable cause that further drugs would be found inside of the vehicle. The undersigned disagrees.

Upon making the stop of Defendant's vehicle, Deputy Smith and Cpl. Massie ordered the occupants out of the vehicle. Deputy Smith engaged Defendant Timothy Wimer. Upon ordering the occupants out of the vehicle, Deputy Smith conducted a protective pat down of the Defendant for safety. "After lawfully stopping a vehicle, police officers may frisk any occupant of the car if

there is 'reasonable suspicion that the person subjected to the frisk is armed and dangerous.'" United States v. Brooks, 685 Fed. Appx. 229, 232 (4th Cir. 2017) (quoting Arizona v. Johnson, 555 U.S. 323, 326 (2009). "Courts look at the "totality of the circumstances" of each case, Arvizu, 534 U.S. at 273, for 'specific and articulable facts demonstrating at least a minimum level of objective justification for [believing] that criminal activity is afoot.'" United States v. Chiles, No. 1:18-CR-07, 2018 U.S. Dist. LEXIS 62543, at **29-30 (N.D.W. Va. Apr. 11, 2018) (quoting United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

Here, due to the suspicion of Defendant having an active federal warrant for his arrest in conjunction with the vehicle's attempt to evade the stop by law enforcement, the undersigned finds there were sufficient specific and articulable facts under the totality of the circumstances to believe Mr. Wimer may have been "armed and dangerous." Therefore, the undersigned finds Deputy Smith's protective frisk for officer safety was justified. Upon conducting the protective frisk, the Defendant admitted he had a lighter and a "tooter" in his pocket. Deputy Smith recognized the word "tooter" as slang for drug paraphernalia.

Further, upon walking along the driver's side of the vehicle, Deputy Smith noticed in plain view, a brown Crown Royal bag underneath the driver's side door of the vehicle. (See Gov. Ex. 4, CD of Body Camera Footage, ECF No. 71-3, at 1:25 – 1:33). Upon asking Mr. Wimer "what's this under the car you tried to ditch", Mr. Wimer responded it was "just empty containers, actually one might have a little bit of meth in it." See Id. at 1:25 – 1:35. Mr. Wimer's statement regarding the Crown Royal bag provided probable cause to open the bag, wherein the officers located suspected methamphetamine. Based on the location of the bag, it is entirely logical to reason that the bag had been discarded from the vehicle prior to the officers engaging the occupants in an

effort to hide the bag from law enforcement. This evidence, along with the drug paraphernalia found in Defendant's pocket, provided the officers with probable cause to believe contraband would further be located within the vehicle. Accordingly, the undersigned finds the officers' actions were justified and probable cause existed for the search of the vehicle.

### 3. The undersigned recommends Defendant's Motion to Suppress (ECF No. 63) be denied because the search warrant obtained was lawful and properly issued based upon probable cause.

Last, Defendant argues that the subsequent "warrant should be found invalid because it lacked probable cause, the affidavit materially omitted the fact that the vehicle was searched and there were no drugs found, and the officer relied upon the illegally seized evidence to seek the warrant." The undersigned disagrees. The undersigned is of the opinion that the search warrant was sought following a lawful stop of Defendant's vehicle and a subsequent lawful search that was based upon probable cause that the vehicle contained contraband as detailed above. Upon searching the vehicle, Cpl. Massie located a handgun and officers decided to stop the search and apply for a search warrant prior to continuing the search of the vehicle. The undersigned disagrees with Defendant's argument that there was no probable cause to believe the vehicle contained contraband and evidence of drug distribution. All the evidence found prior to the application for a search warrant was indicative of both drug use and distribution.

Further, Defendant's argument that the officers omitted the fact that they had already conducted a search of the vehicle and did not find illegal substances in the vehicle prior to applying for the search warrant is without merit. While the officers began their search, they had not completed an exhaustive and thorough search of the vehicle at the time they applied for the search warrant. In addition, officers had located a Crown Royal bag of suspected methamphetamine that had clearly been discarded from the vehicle prior to law enforcement's engagement with the

Defendant and other occupant of the vehicle. It is clear that the bag of suspected methamphetamine had been located within the vehicle prior to the traffic stop. This evidence, along with the handgun, provided a sufficient bases to believe evidence of drug distribution may further be located in the vehicle. Therefore, the undersigned finds the search warrant was valid and lawfully supported by probable cause. Accordingly, the undersigned **RECOMMENDS** the District Judge **DENY** Defendant's Second Motion to Suppress *Physical Evidence*. (ECF No. 63).

## V.    <u>CONCLUSION</u>

Accordingly, for the reasons stated herein, the undersigned **RECOMMENDS** Defendant's Motions to Suppress (ECF Nos. 54 and 63) be **DENIED**.

Any party shall, within two (2) (business) days[10] after being served with a copy of this Report and Recommendation, **on or before Tuesday, November 5, 2019**, file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the Honorable Thomas S. Kleeh, United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of**

---

[10] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. <u>United States v. Barney</u>, 568 F.2d 134, 136 (9th Cir.1978)." <u>United States v. McDaniel</u>, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also <u>United States v. Cunningham</u>, 2011 WL 4808176, at Footnote 1 (N.D. W. Va., Oct. 6, 2011) and <u>United States v. Mason</u>, 2011 WL 128566, at Footnote 7 (N.D. W.Va., Jan. 7, 2011). In this case, the final pretrial conference is set before the Honorable District Judge Thomas S. Kleeh on November 8, 2019 and Jury Selection and Trial is set for November 18, 2019.  The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation from fourteen (14) days to two (2) days.

**appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to the Defendant at his last known address on the docket, any parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on Friday, November 1, 2019.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE